Hear ye, hear ye, this Honorable Appellate Court for the 2nd Judicial District is now in session. The Honorable Anne B. Jorgensen presiding. Your Honors, the first case on the docket this morning is 2-24-0433, the People of the State of Illinois Plaintiff Appellant v. Jeffrey Thrall, Defendant Appellee. Arguing on behalf of the Appellant, Mr. David S. Friedland. Arguing on behalf of the Appellee, Mr. Patrick Hogan. Okay, Justice Shasta, can you hear us and see us?  Okay, good. Then, gentlemen, are you ready to proceed? Yes, Your Honor. Okay, then, when you're ready, Counsel. Thank you, Your Honor. Good morning, Your Honors. My name is David Friedland. I represent the People of the State of Illinois in this matter, Appellant in this matter. May it please the Court, Counsel. People are here today asking this Court to reverse the trial court's order of suppression, granting the defendant's motion to suppress the defendant's video-recorded confession to the murder of his aunt. I'd briefly like to begin by touching on a few issues with the standard of review, and then I'll dive into the substance of the alleged invocations themselves. Just from the briefs, the parties dispute a little bit the standard of review. I mean, the defendant's statement here was on video. The people submit that anything on the video, there's some disagreement below as to the exact language of the first alleged invocation by the defendant. And I would submit that Your Honors can view the video and say that that portion of the review should be de novo, that you're not bound by the trial court's contemplation or interpretation of the video. That said, anything else, of course, would be factual findings would be subject to deferential review. Ultimately, I mean, the dispute over what the defendant first said, and I'm going to address now the first alleged invocation, is partially understood because the defendant was eating. I mean, he had a mouthful of food after the initial statement. So whether the defendant said, not really, I don't got nothing to say, you know, or if he said, I don't got nothing to say, I don't know. All of that is really irrelevant. I think what sets this case apart and what I'm asking Your Honors to find is that it's... Sorry. I don't want to talk about it, or I really don't want to talk about it. I've got, not really, I don't got nothing to say. I don't, you know, that's... I don't got nothing to say, and 820, I don't really want to talk about it. Well, that's the second. So the second and third, I'm starting with the first. Then there's a second, third, and fourth, which occurred within a minute of each other, and I have different arguments, as I pointed out in the brief. If Your Honor wants me to jump to those, I will, but... I hear him talking about this when he was eating a sandwich, but go ahead. The sandwich is the first, is at 803, which I've detailed in my brief. The sandwich, the first invocation when he's eating the sandwich, alleged, I keep saying that, but the first alleged invocation occurs while he's eating the sandwich, immediately after the Miranda rights. The officer reads the defendant the Miranda rights. He asks him to sign. The defendant, he says, hey, I really appreciate you being cooperative with us. The defendant has food in his mouth, and then he mumbles something that to me and to the court was not really, I don't got nothing to say, you know, or I don't know. Yes, Judge Justice Burkett. I apologize, I can't hear you. Joe, you're mute. Can we just pause it for a moment and see if I can get this? I can hear you. Okay. Vickman's identified the video, the interview, as true and accurate. Right? Yes. The interpretation that was made later, after the hearing was completed, and after the court ruled, then the state seeks to introduce another video, which is supposedly better quality, but that's not in the record. Sure. So that issue is forfeited. I would say that the issue of any of the state's arguments that, yes, the video's not in the record, can't listen to it. My understanding was not that it was a better quality video. My understanding was that they were saying we went back and listened to it with better headphones and better equipment, which your ears could do. I've listened to it multiple times. There's two syllables that are uttered, not three. Correct. I don't know. It's two syllables. You know. That's what I heard. What I'm saying, so we have a difference here. Everybody interprets it differently. It's he has food in his mouth. You're right. It sounded like, you know, to me, I don't think this is dispositive of the issue. You know, or I don't know. He makes the same. Sorry. The timing is very important. This is immediately after he has given his rights. The officer's thanking him for his cooperation, and he immediately says he doesn't have anything to say, you know. Now, this officer who has allegedly, according to the record, significant experience also did not push the waiver form back and say, hey, sign here. It's a completed form. He acknowledges that he was given his rights, but the waiver form is blank. An experienced officer like Vickmans is going to go, hey, you didn't sign this and push it back and execute the waiver. He didn't do that. Isn't that a relevant fact for us? Yes, that would be a relevant fact. My understanding was that he had signed it. I saw the video. I saw him sign the video. And I apologize in the record if the form is blank, but I saw him sign the video in the record. He signed the acknowledgment of his rights. He did not execute the waiver of his rights. The form is blank in that regard. The officers filled it out. They intended to have the defendant execute a waiver, but he did not. And his shaking of the head and his saying I don't have nothing to say is 100% consistent with someone who is invoking his rights. Well, I would disagree. The way you're portraying his statement is that you've said it in an assertive tone and you've given no equivocation whatsoever. That's not what that defendant did. Not really. I don't know what to say. It's a whole lot different, Your Honor, than I don't have anything to say and shutting down the interview. He didn't shut down the interview. Where I want to focus my argument is that Vickmans continued and said, well, let's start with your name. Well, that's not the phrasing he used, though. He asked him, well, hey, where I'm focusing is exactly right. The next two questions are crucial to the state's position here is that Vickmans asked to clarify. He did not just push forward and be like, give me your name, and then they go forward. What happened afterward was you can just eat your sandwich. I'm going to ask you some questions if that's all right. It's clearly an inquisitive tone. And that defendant, you're right, could have shut it down right there and said nothing else. And he didn't. He said, well, hey, can we start with your name? He didn't say give me your name, as Your Honor just pointed out. He said, can we? Can I get your name? He gave him two open-ended questions to allow him to yes or no. Is it close? Yes. But the total context matters, the totality of the circumstances. It has to be clear and unambiguous. When you look at his mannerisms and you look at his phrasing and the way he had talked and Vickmans' testimony that earlier he had been somewhat cooperative with the police, all of that goes to whether Vickmans' interpretation right there was whether that defendant was clearly and unambiguously invoking his right to remain silent or whether he could take those extra two questions that are innocuous and not designed to, well, to elicit inculpatory statements, whether he could ask those two kind of clarifying questions, that's the state's position. As Vickmans said, well, is this guy invoking or not? And let me ask you a question. Is that okay with you? And he immediately responded by giving his name. And this defendant wanted to talk. I mean, when you look at the context of this, this defendant then sat with them going through his list of aggrieved circumstances with his motive, with where he wanted to go, how he hated his aunt, how he hated his family. This defendant was not invoking his right to remain silent and end all questioning. Yes, Your Honor. The question is whether a reasonable police officer in these circumstances would understand the defendant's statement to be an invocation of his right to remain silent. So everything that happened after that, if we were to find that that wasn't an invocation, what happened after that's your involvement? True. If he invoked there, Your Honor, I get it. If he invoked there and that's your finding, everything afterward is done. I get that. Mr. Friedland, if he did not, if it's your position he didn't invoke there, let's move on to the next statements that he makes. Sure. 820, 822, 822-37, and so forth. Yes. The I don't want to talk about this, I don't want to talk about that, those are the natures of the alleged invocations, 2, 3, and I'm going to lump 4 in there because 2 and 3 are this and that, and you really have to find whether the this and that are specific to end all questioning. And the state's position there is what I was alluding to in the circumstances of the interview. The defendant wanted to share. This was not a person, he knew he was done, he shared freely his name, his history, his work background, his family, what led up to his dispute, what his beefs with his attorney was, why he went to the house, why he got mad, why he committed, went inside. Really all he didn't want to say was the actual details of the murder, and I think the case law supports that there, is that there were different topics discussed, and the one thing he didn't want to say in the qualifier, this and that, was what he physically did to his aunt. And that is not an invocation of his right to remain silent, because when they would go back and then they'd talk about the death penalty or ask him additional questions, he talked again freely. Oh, they had a full conversation. So I don't think that the I don't want to talk about this or I don't want to talk about that are clear invocations or attempts to invoke his right to remain silent. Those are simply I don't want to talk about how I brutally murdered my aunt, which it was every single time they asked him, well, what happened into the trailer? They talked to him about everything leading up to the trailer. What happened when you went inside? I don't want to talk about that. I don't want to talk about that. I don't believe under the case law that I've set forth in the brief that those are invocations of the right to remain silent. Yes, sir. Interpreted the defendant's statement. I really don't want to talk about it. It's him saying he did not want to talk about the act itself.  But did not, it did not mean he did not want to continue the conversation. Does this make any sense? He says he does not want to talk about the subject of his arrest, which is the murder, the case under investigation. And Vickman says, I understand you don't want to talk about it. How is that not an invocation? Well, I don't. He has talked about it. He has talked about like that. I, he was walking there. He went there. He was mad that she wouldn't let him in. She was mad at his whole family for taking his money and catching him in trouble. He talked about everything except the stabbing. And I think that's understandable. He was remorseful. If you look at his demeanor throughout the interview, this wasn't a person who was not, who was resistant to detective Vickman's questioning. He engaged in the questioning, calm, free flowing, conversational. Does a defendant have, does he have to be resistant in order to invoke? No, he could do it very politely. I agree. He could politely invoke. He doesn't have to be resistant. However, in this matter, it's whether the question is, whether it's a clear and ambiguous unambiguous invocation to end all questioning. And that's not what he was saying. I think the qualifier, this and that are what sets that apart from a straight invocation because he would talk. Yes. Does he, does he say he doesn't want to discuss the stabbing, but he was remorseful. He said, I, you could tell he was remorseful. Was he saying, I don't want to talk to you detective Vickman's anymore by saying, I don't want to talk about this. And I think it's a reasonable interpretation that he was not, he just didn't want to describe how he actually entered the house, stabbed his aunt hundreds, multiple times. How about this? If, if go ahead. However, when he invoked, when he said at the beginning of the interview, I don't have anything to say. Now you don't have nothing to say. You know, that's before he had made any statements implicating himself, which is different than the cases you cite where for, in all jokes, for example, that the defendant tells the jailer, I want to confess, but then he doesn't want to talk about the details or the particular details and the other cases. In this case, Says right up right out of the gate. I don't have anything to say, you know? Yes. Well, I think that the, the, it's more akin to Aldridge and that he does want to talk about the murder. He just doesn't want to talk about the details. He doesn't make any statement at all. That's not like Aldridge and Aldridge. The defendant wanted to confess. He told the jailer, I want to confess. My, my position and belief is what, I mean, I, I see my time. May I finish my last thought in response to your questions? The defendant is indifferent here. He, of course, the first statement is what it is, but the officer, what my argument is to the first statement is that he sought to clarify it. And he gave the defendant to open-ended questions to not say anything at all. And he didn't the second part of whether or not he wanted to confess. I think that's borne out by, he was willing to have a free flowing calm conversation with, with the with the officer. And that's the nature of this. Wasn't Ward. This wasn't Cox where they're badgering him and hounding him. You're right. It does. He can do it politely, but in this case, he did want to discuss and all of those other details are certainly relevant. The background, the motive, every. It's certainly relevant and admissible evidence to the state's case that, and necessary for the trial as to why he went there. If the second invocation of this and that are invocations or slow statements or invocations, everything before those are still relevant. We're asking for admission of those. With that, unless you have a question or I'll save my time for rebuttal. I'll save it for your rebuttal. Justice for kid. Any further questions? Justice. No further at this time. Thank you. Okay. You will have a, obviously a chance for a reply council when you're ready. Thank you, your honor. Good morning. Your honors may please the court. My name is Patrick Hogan. I am here on behalf of Mr. Thrall urging this court to affirm the judgment of the trial court below suppressing Mr. Thrall statements, which he made after invocation of his fifth amendment, right? Turning to the first invocation. I would agree with the state that the context here matters. The statement is made on the onset of the interrogation. The officer had just read his Miranda warnings to Mr. Thrall. And the officer says, I really appreciate you being cooperative with us to which Mr. Thrall responds. Not really. I don't got nothing to say. Clearly here, he is stating that he did not want to cooperate with the officer and that he did not have anything that he wanted to say to the police. The state suggests that Mr. Thrall had an opportunity to clarify and that the officer indeed asked clarifying questions, addressing those in that order. The fifth amendment does not require that Thrall sees any opportunity to  Instead. Once Mr. Thrall invoked his fifth amendment, right. It was the officer's duty. Disgrupulously honor and cease questioning. As for the contention that the officer asked clarifying questions, he simply did not ask a clarifying question. Clarifying question would be something to the effect of what do you mean by that? Or could you explain instead? The officer asked for Mr. Thrall's name, which is a question in furtherance of the investigation does not clarify what Mr. Thrall meant at all. As to the state's point that Mr. Thrall continued to ask or answer questions after invoking his fifth amendment, right. That again here is irrelevant. Once Mr. Thrall made his invocation, the duty then was not on Mr. Thrall to continue to resist the officer's questioning, but on the officer to scrupulously honor his fifth amendment, right. What significance is the defendant's cooperation before the interrogation began, where he provided his DNA sample, freely gave his clothes and clothing to the officers. Is that relevant to become his understanding of the defendant's emotional responses? It is not your honor. Mr. Thrall was not obligated to resist or oppose any effects by the officers. It was not required to not waive his fourth amendment, right. He was not required to resist and have the DNA or the clothes taken for his fifth amendment, right. To be invoked. He can give his, he can give consent to his DNA being taken or his clothes being taken and then still invoke his fifth amendment. Right. He is not required to resist to the utmost. It is not the fifth amendment standard. The standard is once a clear and an invocation is made. That a reasonable officer would know was a fifth amendment, right. Invocation questioning must cease. So no, it is not relevant that he cooperated in other aspects of the investigation. Mr. Hogan. I'm going to ask the same as I asked Mr. Friedland, assuming that that first statement when he was eating his sandwich was not him invoking his right to remain silent. How about eight 28, 22, 28, 22, 37, eight, 22, 51. How did those show in your mind that he invoked his right? Other than, or as Mr. Friedland said, he just, he wanted to keep talking. He just didn't want to talk about those specific, the specific murder. Well, I think that that is the point he didn't want to talk about the specific murder, but that is exactly what the fifth amendment protects against. He was then arrested and now charged for, for the murder. And he said that he did not want to talk about this, that, and it, all of those in reference specifically to the charge conduct. So he, he answered those questions. What made you snap with, I don't want to talk about it. And when asked when, what did you do next? I don't want to talk about this. And when asked what happened when you arrived at your aunt's house, I don't want to talk about that. All of those are questions. Intended to get Mr. For all to confess to the charge conduct. And that again is precisely what the fifth amendment is there to protect against turning to the state's point that he didn't want, excuse me, did I. Sorry. I thought I heard someone speak up turning towards the point that he didn't want to talk about the details. He was not being asked about the details of the offense. He was being asked very specifically what happened next designed to convince Mr. Thrall to confess to the charge conduct. The defendant, Mr. Thrall immediately signed the acknowledgement of his rights. Isn't it reasonable for an officer to believe that when he signed the acknowledgement that he was willing to engage in conversation with the officers? No, your honor, because I believe that that is precisely what it was an acknowledgement, not a waiver here. The, the waiver form of the acknowledgement form was read to Mr. Thrall. The officer stated, could you just sign here saying that I just read this to you? Suggesting that Mr. Thrall signature then is indicative of his acknowledgement that he indeed was read his rights. Not that he was intending to waive his rights. I should further point out that the video shows that he didn't read the form and the signature is on the witness line. He did not even sign on the, the line that was designated for him and a reasonable officer should have known that the officer's own statement. Can you sign this? Just saying that I just read this to you, followed by Mr. Thrall's not reading it and signing on the incorrect line was not a waiver followed very clearly by not really. I ain't got nothing to say. Clearly invoking his fifth amendment, right? Is, is Vickman's interpretation of the defendant's responses relevant to our consideration? Your honor, it's still an objective test. The test is what a reasonable officer interpret Mr. Thrall statements to be an invocation of a fifth amendment, right? Whether or not Mr. Mr. Vickman thought that this was an invocation or not to the extent that it's relevant, the trial court did consider this and it does not particularly matter what he specifically thought Mr. Thrall meant.  Mr. Vickman's did state and did testify to the trial court. One that he did not believe it was a fifth amendment invocation. And two that he also felt that the defendant was kind of still processing all of this and, you know, kind of walking through it, still processing it. So, you know, he felt that the defendant, you know, really wasn't think it wasn't like waving. He was like shaking his head and just still processing everything. So he felt the officer felt that he was just, just listening to the defendant, processing everything that had just happened. And that he wasn't really looking at as a confession at that point. Your honor. The officer did testify to that and it did state that he believed Mr. Thrall was not emotionally ready to talk about the act itself. What does that matter? I guess is my question. And I do not. Does it matter if he doesn't want to talk about the act or not talk about anything at all? Is there a difference? It does not matter. He doesn't want to talk about the act is precisely what he was arrested and is now charged for. He did not want to talk about the act. What happened when he got in the trailer? Yes, your honor, which is precisely what the fifth amendment is. The conversation when Vickman's is saying, I understand how you feel. I understand. You don't want to talk about it. And he acknowledged the defendant's reluctance. Isn't that, doesn't that show that the officer his understanding was not that the defendant was X, you know, exercising his right to remain silent. He was just emotionally not ready to talk about the details. Your honor, I have two, two responses to that first, whether or not he was emotionally prepared to talk about it or simply didn't want to talk about it because he didn't want to be charged is not part of the fifth amendment analysis. If he invoked his fifth amendment, right, he can invoke it for whatever reason. If he doesn't want to make an incriminating statement, he doesn't want to make the statement. The duty is then on the officer. It is relevant whether or not he was emotionally unprepared or was making some tactical legal decision. As for the details, I don't believe he was being asked about the specific details here. He was not being asked questions after the confession about what occurred to, uh, to make the murder happen. We'll say he was being asked what happened next. He was being asked to confess to the act itself. The act of course, being the charge conduct for which he was then arrested and is now charged. Isn't that the, where the inculpatory statements come from? I mean, some of the background, but it's not necessarily inculpating, but telling or being questioned about the acts that give rise to these charges. That's the crux of the fifth amendment, isn't it? Absolutely. Your honor. And that's precisely what the fifth amendment. So what's the extent of clarifying questions? I'm still puzzled by that a little bit. How much leeway do we give officers when a defendant makes a statement such as I have nothing to say? I think in that context, your honor, it's fairly clear. Uh, the standard is what an objectively reasonable officer interpreted to be a fifth amendment invocation. If the officer is unsure, sure. He could ask a clarifying question to, to bolster his understanding. However, here, no clarifying questions were asked. The officer simply continued test, uh,  So you view all the subsequent questions after these, um, initials, the four statements that we're talking about as not being, uh, properly a clarifying question, but simply a continuation of questions designed ultimately to invoke an, uh, a statement. Yes, your honor. The, after the first statement going back to the, the onset of the interrogation, the purported clarifying question was what is your name, which might be not particularly harmful, but it's still in furtherance of the investigation and offers no clarity as the officer was understanding. As for those next invocations, the questions were not intended to clarify what he meant by. I don't want to talk about this, or I don't want to talk about that. The officer did say something to the effect of, I understand you don't want to talk about this, or I understand you don't want to talk about the act itself. However, those are not particularly clarifying. And to the extent that they are, they clarify that Mr. Thrall did not want to talk about the conduct for which he has been charged. In the video says to the defendant, I realize you don't want to talk about it. So that was Vickman's understanding. Right. Yes. And I think from that, while Mr. Vickman said he did not believe that that was a fifth amendment invocation, I think a reasonable officer with that very understanding would understand that Mr. Thrall did not want to talk about it being the conduct for which he was unarrested is now charged. So if Mr. Vickman's did not believe that was a fifth amendment invocation, I think to the extent that him saying, I don't, I understand you don't want to talk about it shows that even his understanding was that Mr. Thrall did not want to talk about the conduct for which he was then arrested and not charged. The fifth amendment is here to protect against. I should. He was being, he was being asked to admit to the charge conduct itself here being asked to happen about what next, when he got to the residence, the officer himself even said, I think we know, we all know what we're talking about before Mr. Thrall makes his admission to stabbing his aunt. Well, I think it's clear here. Yes, we do all know what we're talking about. We're talking about the offense that he was unarrested and is now charged. And it was clear from Mr. Thrall statements that he did not want to talk about it, this, and that, that he did not want to talk about precisely that the conduct for which he was then arrested and is now charged with, which is precisely the sort of conduct and the sort of statement. The fifth amendment is designed to protect us from, from being compelled to testify against ourselves and make incriminating statements. Mr. Thrall clearly did not want to make these statements. And yet the officer persisted in asking these questions. Testified that he considered the defendant of the, the shaking of his head to just be a mannerism that he shook his head throughout the conversation and quote a variety of ways. Do you recall any segments in the video where the defendant was just shaking his head or was he only doing that when he was indicating a negative or a no. Your honor, he was doing that when he was indicating a negative or a no fairly vigorously is when I noticed it. And I think that it's found in the trial courts, finding a fact as well that Mr. Thrall was shaking his head when he made these statements. I think the trial court even made the finding that he shook his head more vigorously after the second questioning of what happened when you got into your aunt's residence. I think indicating that Mr. Thrall did not want to talk about those statements and emphasizing the verbal statements he made. In conclusion, Mr. Thrall's statements were that that a reasonable officer would have known were an invocation of his fifth amendment, right? Yet the officer here failed to meet his constitutional duty to scrupulously honor those invocations. So this court should affirm the ruling of the trial court. Thank you. To that justice Burkett, any further questions? Thank you. Okay. Justice Shostak, any further questions? None. All right. Mr. Friedland, then you may proceed. I apologize. I keep taking my microphone off because they are cutting the grass at my office with, I don't know what they're using out there, but it is a lot of noise. So I apologize for the background noise. All right. I'd like to bring in, I'll address three things. Each of your honors raised a point during defense defendant's case. First, your honors asked a lot of questions about Vickman subjective belief, and I'm just going to point to the premise of law, whether that's relevant in the analysis. I'm going to point to people V Nielsen, I cited in my brief, which was cited by this court in award, which states that I'm sorry, that was first district case. That states a first, a questioning officer's reaction to a purported purported invocation is often relevant. And in that case, that in Nielsen that was the defendant put his hands over his ears and shook his head saying, no, no, no, no, no. What I think that puts the bed, any question of whether or not Vickman's subjective belief is relevant. And he testified, sorry. Vickman's subjective beliefs is really crystallized by this statement that he makes. He says that he considered the defendant's statement that he didn't want to talk about it. He said that he was that that was a conversation that we were about to have about the egregious act. He said the defendant did not want to talk about the egregious act. Is this the type of interpretation of a defendant's custodial statement? I really don't want to talk about it. Vickman's understood that the defendant did not want to talk about it. That's what he understood from the defendant's statement. Well, I'm going to point there's case law supporting that. I'm going to point to Criswell, which is citing record that says mere refusal to answer a single question is not construed as an expression of the defendant's desire to remain silent again. And I'm then going to point you to land land game, which I've cited where the defendant said the exact same words. I don't want to talk about that. The phrasing is exactly the same. And in that case, he didn't want to divulge one detail about, I think was the where he lived or where his car was on the night of a murder. Is it a grisly murder? No, but that's, that's the support for a defendant doesn't need to one question. I don't want to talk about this. I don't want to talk about that. That's where the officers don't have to interpret that. And in this case, it was the act shirt. I understand what your honor is getting at. Vickman said he didn't want to talk about the grisly murders. He didn't want to talk about the grisly murders, but he was willing to talk about every other thing. Mr. Freeland, all of the cases that you're discussing that would support the quote unquote detail are cases where a defendant is already in the conversation, has made inculpatory statements, but does not want to reveal a particular detail. That is different than this case where the defendant says, I don't have nothing to say. And, and it's before he makes any inculpatory statement. Well, again, your characterization of defendant statement, I'm assuming what you referred to was the first invocation at 803. And I don't believe my view of the video and the officer's interpretation of it was not that it was an essential assertive inquiry. And I'm going to compare, let's what you've said, how you've characterized it. Justice Burkett is much more akin to the three cases that the trial court ruled on. And I'll site discuss those briefly with my time. You've got ward Cox and Flores and ward. He said, I don't got nothing to say. And that's what the defendants relying on primarily what the trial court said, but the defendant then stopped talking. He stopped. It was a follow-up by the detective. The detectives badgered him. They took a break. They come back in. He says, I don't have anything to say. I don't really have that. I want to say anything. And then he stopped talking. So word is completely distinguishable. Again, my focus here is that the officer said, ask two open-ended questions. Can we go with that? If you don't mind, he certainly could have said, I mind, or he could have said nothing at all. And that's, that's what sets this apart from ward floor. Cox was, I'm sorry. Flores was the officer gives him the morale rights, which is somewhat akin to this case. And right after Miranda, the defendant says, no, he says, do you want to talk to us? The defense says, no, not really. Well, that's not what this guy said. He in a equivocated. I don't know. I really don't got nothing to say, you know, with food in his mouth. So the two open-ended questions from there, set this apart from Flores Cox as well, was a, was a straight indication more along the lines of what your honor was talking about. I just don't think the two open-ended name questions, or if you don't mind, I believe that those set this case apart for the initial and for the initial alleged invocation from the cases that you said. And certainly I believe your characterization, just to break out of the defendant's mannerisms and his statement is not, not a hundred percent accurate, but the video speaks for itself on that. So these were questions. The first question that in your example was, then do you want to talk to us? And the defendant in that case said, no, here. He didn't ask him that. He said, can I ask you your name? And the guy gives him his name. What happened to scrupulously honor or clarify if that was an invocation? It seems to me, your officer just continued to ask questions and figured, what have I got to lose? He's invocated his rights, but I'll just keep asking questions and we'll see what happens. I mean, shouldn't there be a bright line? Isn't that the point? Defendant invokes his right. You honor it. You get up and walk out of the room. Or as counsel said, very clear, clarifying questions, not what's your name. How does that clarify what he just said and whether or not he was invocating his right? Not to badger you, but you can badger me. I, I, my last thought to your honors point was that when you say that, he said, he asked him his name. He did. The next statement was, you can eat your sandwich. I'm going to ask you some questions if you don't mind. So where is the clarifying question? You said it was its name. It's important to have that because that's what it is. That is,  do you mind if I ask you questions? That's the clarifying question. If you'd honors disagree with it, I can see your honors thoughts on it, but that's what sets it apart. I submit. He did ask that clarifying question and his reluctance to discuss it and going forward after that statement. I understand how this works, but after that first statement, he just didn't want to discuss the grizzly details of the murder of his aunt. And that's a separate topic from everything else that he said. Plus everything that he did say up until that, those 820 or the 2nd and 3rd, 4th indicate alleged invocations are relevant to the murder. And we ask that those be admissible. We just ask your honors not to conflate his unwillingness to speak about how he murdered his aunt with an unwillingness to completely talk to police and invoke his right. And so we'd ask you to reverse the trial court tomorrow. Thank you. During the cross examination, then it was very possible that he had interrupted the defendant when the defendant was trying to articulate what he said. He began to say again that he did not want to talk, but acknowledge that he interrupted him. What does that say about his understanding of the defendant's comments? Well, I think that the Vickman's explained his understanding of the defendant's comments. That was a 3 people were talking at once. Is that the best mannerism of interrogation? No, of course not. However, that happens in just about every tech interrogation where people get to the substance of the, the, the meat of the interrogation, so to speak, he was asking about the death penalty. They were trying to assure him that it wasn't the death penalty. They all talked over each other. I believe that that I don't believe that was detective Vickman's. If you look at the entire context of the interrogation, he wasn't trying to railroad this guy. This wasn't. And I think that matters. The calm, the courteous up until that 1 point, this was very calm,  everybody back and forth, very clear. It wasn't an attempt by the officer to steamroll, so to speak, the defendant's 5th amendment rights. That was just a,  we're trying to clarify the law for you. So I think that's, that's a good point. Mr. Freeman, and I was going to ask this question earlier, and I'm glad you brought it back up. So, if somebody. Is trying to invoke the rights or most the rights that the police officer. Is pleasant about it, then you can do that. I mean, you can violate somebody's invocation of their 5th amendment, right? As long as you're courteous and calm. No, you can't violate anybody's rights. As long as you're courteous and calm. But what I'm suggesting is that. That portion of the interview, where that, where he acknowledged on cross examination, interrupting him was simply an attempt by those officers to try to alleviate the defendant's concern about the death penalty. That wasn't a, I'm cutting him off because I think he's about to invoke his right to remain silent. That was, he's asked the question. And if this is his concern, let's alleviate it. So we can get back to the, the. The statements are the meat of the interrogation. Well, I don't think anybody was indicating that he was going to be cutting him off if he was about to get into the. Gory details of crime. I mean, I, I appreciate they were talking over each other to tell him,  well, this isn't a death death penalty state or something like that. But I mean, that the, and I appreciate the police officers. The detectives, whomever were courteous,  If somebody's invoking their rights, whether you're courteous or not. Shouldn't matter, should it? No, if he's invoking his rights, he's invoking his rights. It can be the most polite and calm conversation ever. However, I. As to those, that portion of the record again,  my position, the state's position there is that that was an invocation. That was a, I don't want to talk about this. And what happened right? When you got to the door, I don't want to talk about that. What happened when you went inside? I don't want to talk about this specific topics. Well, what happened when you were released from jail? Well, I walked here. I walked there. I'm willing to talk about that. There are separate topics and the refusal to just talk about one specific. A portion of that does not show a complete unwillingness to speak with police. It just doesn't show that he was looking to invoke his right to remain sad. That's a very sound argument. If the initial statement was not made, that would make a very sound argument because then you wouldn't be talking merely about the details. Let me ask you one other question.  The big man's testimony that the defendant shook his head throughout the conversation in a variety of ways. Can you point to any segment or segments where the defendant was indicating anything other than a negative or no, when he was shaking his head? I can't point. I cannot sit here and point to the record sites of that. I've been watching the video several times. He sits back. He relaxes in his chair. He has a shake and a mannerism where it's very subtle and it's slight. I thought the same thing as your honor is question as well. If he's only shaking his head, no, that's going to support the invocation. Of course it is. However, Vickman's testified. I think he was referring to the absence of me being able to talk to Vickman's. There was a lot of back forth, kind of head down, looking down. I cannot point to the video, to the specific portions of the video. And yes, I acknowledge that he shook his head at that one portion where he wanted to talk about when Vickman's asked him what happened when he went inside. I've already made my argument on that. So I can't identify a specific portion of the video, but I did see the defendant's mannerism support Vickman's testimony that throughout the defendant had mannerisms that looked like he was what to me appeared to be a beaten down and clearly consciously guilty individual. So with that, unless there's any further questions, I thank you, your honors for your time this morning, and we would respectfully ask you to reverse the ruling of the trial court.  any other questions? Shaking my head, no. Still noted, Justice Burkhead. I think that was a no. All right, counsel, we appreciate your arguments and your time this morning, particularly after we had to reschedule this. So you will have a written decision in due time. And again, thank you for your time this morning. Yes.